M. M. Payne, Appellee, v. George W. Hall et al., Appellants.

NAVIGABLE WATERS: Ownership of Lands—General Principles. The following principles relative to the title to the bed of navigable streams and to the riparian lands and accretions thereto along such streams are recognized:

    1. Meander lines and high-water lines are not necessarily coterminous.

    2. The title of the state to the bed of the stream follows the shifting course of the stream.

    3. The title of the landowner to submerged lands which reappear within a reasonable time is not disturbed.

    4. Islands formed in the channel of the river belong to the state, but a tract of land is not an island when it is entirely surrounded by water under high-water conditions only.

    5. A riparian owner is entitled to accretions, even though such accretions extend over the exact spot where another person formerly owned land eroded by the river.

    Evidence reviewed, and held that the tract of land in question was accretion to riparian lands, and not an island formed in the channel of the river.

*Appeal from Fremont District Court.*—E. B. Woodruff, Judge.

DECEMBER 13, 1921.

Action to quiet title to certain lands. Decree as prayed, and defendants Hall and Foster appeal. The facts appear in the opinion.—*Affirmed.*

*R. F. Hickman* and *Wilson & Keenan,* for appellants.

*Tinley, Mitchell, Pryor, Ross & Mitchell,* for appellee.

FAVILLE, J.—This action involves certain lands adjacent to the Missouri River in Fremont County, Iowa. An understanding of the matters in dispute can best be obtained by the examination of the accompanying plat.

MAP
SHOWING SUBDIVISION LINES IN SECTIONS 3,4,10, TOWN 67, RANGE 43
WITH ACCRETIONS THERETO.
SCALE OF CHAINS.

It will be observed that there are three irregular lines running across the plat. The middle of these three lines represents the meander line of the Missouri River, which, it appears from the evidence, was also approximately the eastern bank of the river as it existed for some years after the original government survey, which was made in 1846. As indicated on the plat, the appellee, M. M. Payne, is the owner of numerous 40-acre tracts lying east of the Missouri River in Section 3. He was also the owner of certain lands immediately adjacent to the river. All the portion of Section 4 that was capable of being surveyed at the time of the original survey was platted as Lot 1 of Section 4. The appellee also owned Lots 1, 2, and 3 in Section 3, all abutting upon the original meander line of the river.

The undisputed evidence shows that, many years ago, the river began a gradual process of erosion to the eastward, and encroached upon these lands belonging to the appellee. This process continued until a time not definitely fixed in the evidence, but approximately the latter part of the 80's, when the river had reached its easternmost location. At that time, the river had entirely overflowed and eroded Lot 1 in Section 4 and Lots 1, 2, and 3 in Section 3, and had encroached somewhat upon the land farther to the east. The irregular line to the right in the plat indicates the approximate location which the river reached in this manner. At a later date, not definitely fixed in the record, but in the early 90's, the river began to recede from its new location, and to gradually fill in its former bed by alluvial deposits. It formed a new channel farther west than the original channel had been, and at the time of the trial, the eastern or Iowa bank of the channel of the river was as indicated by the irregular line to the left side of the plat.

It is the contention of the appellee that the lands marked on the plat as being accretions to Lot 1 of Section 4 and Lots 1, 2, and 3 of Section 3 belong to him, and he seeks to quiet title to said land. It is the contention of the appellants that the lands in question did not accrete to the lands of appellee, but that an island was formed in the river bed, and that the accretions were largely made to said island, and not to the mainland.

I.   A few general observations may help us in arriving at a

conclusion in the case. It is conceded on all hands that the Missouri River is a navigable stream. Meander lines are not boundary lines, but are only lines of survey, to determine the area included in irregular tracts bordering on navigable streams or lakes. Riparian owners along the banks of the Missouri River in Iowa hold title to the land to high-water mark, regardless of whether or not the same coincides with the meander line. *McManus v. Carmichael,* 3 Iowa 1; *Houghton v. C. D. & M. R. Co.,* 47 Iowa 370; *Holman v. Hodges,* 112 Iowa 714.

The state of Iowa owns the title to the bed of the Missouri River from high-water mark to the center or thread of the stream. *Iowa v. Illinois,* 147 U. S. 1; *Hardin v. Jordan,* 140 U. S. 371; *Holman v. Hodges,* supra. If, by a slow and gradual process of erosion, the river washes away its banks and changes its course, the title of the state to the bed of the stream follows the course of the river in forming the new channel. If there is some avulsion of the stream, whereby it suddenly changes its channel in such a way as to cut off a body of land which still remains in such a condition that it can be identified, then the boundary lines of riparian property owners are not changed by such sudden avulsion or cut-off. *Kitteridge v. Ritter,* 172 Iowa 55.

Where lands are overflowed and submerged, and within a reasonable time the waters retire and the land reappears, the title of the owner is not disturbed, and the proprietorship remains in the original owner. *Mulry v. Norton,* 100 N. Y. 424 (3 N. E. 581); *St. Louis v. Rutz,* 138 U. S. 226; *Ocean City Assn. v. Shriver,* 64 N. J. L. 550 (46 Atl. 690).

This rule has also been recognized where lands are removed by erosion, and are restored by accretion after the river recedes. *Allard v. Curran,* 41 S. D. 73 (168 N. W. 761).

Where the lands of a riparian owner are removed by the gradual process of erosion by the river, the land being no longer capable of identification, but having been carried away entirely, and the river occupies the identical space formerly occupied by the lands of the riparian owner, the title to the land so occupied by the bed of the river passes from the owner of the land to the state. This is one of the necessary incidents of riparian ownership. It is also the law that, where an island is formed in the

784 PAYNE v. HALL. [192 Iowa

channel of a navigable river, whether the same be over the original river bed or over a new bed formed by the erosion of the banks of the river, such island so formed in the channel of the river becomes the property of the state. The island is regarded as in the nature of an accretion to the bed of the river, and belongs to the state, the same as the river bed itself. *Cooley v. Golden,* 117 Mo. 33 (23 S. W. 100) ; *Perkins v. Adams,* 132 Mo. 131 (33 S. W. 778) ; *People v. Warner,* 116 Mich. 228 ; *Holman v. Hodges,* supra ; *Bigelow v. Hoover,* 85 Iowa 161.

It also appears to be the law that, where the lands of a riparian owner have been slowly and gradually eroded by a navigable stream, and the river has usurped and taken up the location of said land, the riparian owner of the land at the newly formed river bank becomes entitled to the accretions that may thereafter be formed against said bank, even though they should extend over the same territory where lands of a former riparian owner had been located before the erosion took place. For example, if A is a riparian owner upon a navigable stream, and B owns land remote therefrom, and by erosion the river cuts away all of the lands belonging to A, and leaves B as the riparian owner on the newly formed bank of the stream, and thereafter the river slowly retires from this situation and places accretions against the newly formed bank, said accretions will belong to the riparian owner B, even though they extend over the very space formerly occupied by the riparian owner A. *Yearsley v. Gipple,* 104 Neb. 88 (175 N. W. 641) ; *Welles v. Bailey,* 55 Conn. 292 (10 Atl. 565) ; *Widdecombe v. Chiles,* 173 Mo. 195 (61 L. R. A. 309) ; *Wood v. McAlpine,* 85 Kan. 657 (118 Pac. 1060) ; *Fowler v. Wood,* 73 Kan. 511 (85 Pac. 763) ; *Naylor v. Cox,* 114 Mo. 232 (21 S. W. 589) ; *Peuker v. Canter,* 62 Kan. 363 (63 Pac. 617).

II. Applying these general rules to the facts of the instant case, we find that, by the slow process of erosion, the Missouri River changed its channel and worked eastward until it had entirely cut away the lands in Lot 1, Section 4, and Lots 1, 2, and 3 in Section 3, and other lands lying to the east. The location where these lands had been became thereby a part of the bed of the Missouri River, and title thereto became vested in the state, while so occupied by the river. Appellee was, however,

still a riparian owner; for he owned the lands that bordered upon the eastern bank of the river at the time it reached its easternmost location, as shown on the plat.

Appellants contend that appellee does not, by his pleadings, claim the lands in controversy as accretions to the lands which bordered on the river at the time it was farthest eastward, but only as accretions to the lands which bordered on the original bank, and which were entirely eroded by the eastward movement of the river. In this contention, we think appellants are in error. Appellee's petition and his proof are broad enough to entitle him to claim the lands in question as accretions to lands owned by him on the east bank of the river when it had reached its farthest point of invasion of the lands on the Iowa side. If the accretions formed by the river as it receded from the newly formed eastern bank were accretions to the mainland, then they belonged to the appellee, as riparian owner, in any event, and he was entitled to have his title quieted thereto.

III. It is appellants' contention that, after the river began to recede from its easternmost location, an island appeared in the stream, distinctly separated from the shore, and that this island was located upon that portion of the river bottom that occupied, in part, the location of a portion of appellee's lands before the river wrested them from appellee by erosion. Appellants contend that, when such an island appeared in the stream of the river, it then belonged to the state, although it was located upon the exact spot where the surface of appellee's lands had been before the erosion took place.

We are inclined to sustain appellants' view of the law in regard to such a situation. The maxim *"cujus est solum ejus est usque ad coelum et ad inferos"* does not apply in such case. Appellee did own his land from the highest heaven to the center of the earth; but he so held it with all the incidents of a riparian owner on a navigable stream; and when, by the slow process of erosion, the river removed the soil and took up its bed upon the very spot where the surface of appellee's lands had been, then said place passed to the state, as part of the bed of the stream. Thereafter, if there was an island formed in the bed of the stream, entirely independent of the mainland, such island belonged to the state, even though it was located upon the very

spot where appellee's lands had been located before they were
eroded away. The bed of the stream belongs to the state, as
well when occupied by a newly formed island as when occupied
by the waters of the stream.

Appellants contend that the major portion of the accreted
lands in controversy consists of an island formed in midstream,
and of accretions thereto. Appellee contends that they are all
accretions to the mainland. Right here is the crux of this case.
An island is a body of land entirely surrounded by water. In
*McBride v. Steinweden*, 72 Kan. 508 (83 Pac. 822), the Supreme
Court of Kansas said:

"There is complaint of the instructions, and especially as to
the one which defined an island. Among other things, the court
said: 'It may be stated by way of definition that, to constitute
an island in a river, the same must be of a permanent character,
—not merely surrounded by water when the river is high, but
permanently surrounded by a channel of the river; and not a
sand bar, subject to overflow by a rise in the river, and con-
nected with the mainland when the water is low.' In the same
connection the jury were told that, in considering whether an
island in fact existed, or whether the land in controversy was
accreted to plaintiff's land, they might 'consider the character
and extent of the claimed accretion, the character of the timber
growth, the relative size and permanency of the channels, if
any, around the claimed island, as compared with the size of the
stream, the topography of the land in controversy, the character
of the soil, the growth, if any, of timber or trees, the testimony
of the witnesses, and, in fact, all the circumstances as developed
by the testimony.' Whether the formation in the river was a
sand bar or an island was a question of fact, and was fairly pre-
sented to the jury. It did depend upon the stability of the soil
and the size and permanence of the channels around it. *Rail-
road Co. v. Schurmeir*, 7 Wall. (U. S.) 286 (19 L. Ed. 74); *Shoe-
maker v. Hatch*, 13 Nev. 261; Gould on Waters (3d Ed.), Sec-
tion 166. As the court told the jury, account should be taken of
the conditions named, and also of a variety of circumstances as
to the physical features of the formation, the growth upon it, and
whether the water supposed to separate it from the shore land

was there in times of high water only, or during the ordinary stage of water in the river.''

In *Railroad Company v. Schurmeir*, 7 Wall. (U. S.) 272, the question involved the title to lands bordering on the Mississippi River. The court said:

''At the time of the survey, there was a parcel of land (called by the counsel on one side, a sand bar, reef, or 'towhead,' and by the counsel on the other, an island) lying along the shore of the river, about four feet lower than the mainland of the fraction, and with a channel or slough between it and the mainland. This depression was about 28 feet wide, and the bar or island, in its extreme width, was about 90 feet. Its extreme length was about 160 feet. The main body contained 9.28 acres; this parcel, 2.78 acres. In high water, this parcel of land outside was completely under water; in medium water, it was exposed to view, and the water flowed through the depression; but, at very low water, there was no *flow* of water through the depression. It lay in pools in the depression.''

See, also, *King v. Young*, 76 Me. 76.

The appellants contend, and offer evidence to show, that there was an island formed in the channel of the river that followed the general contour of the east bank and was close to it; that the main body of the Missouri River flowed to the west of this island; that a portion of the water of the river flowed to the east of the island, and that there was a well defined river channel there, which is referred to by the witnesses as the ''Iowa Chute.'' There is no question that there is a depression now existing in the accreted land, with more or less well-defined banks, and extending, in the general course of the river, from near Section 4 to Section 23. The appellants seem to concede that the land lying east of the so-called ''Iowa Chute'' was accreted to the mainland, but it is their contention that all lands lying west of the ''Iowa Chute'' accreted to an island.

As we understand the record, the evidence shows that there are well developed trees, both east and west of this ''Iowa Chute,'' and that they are substantially larger than the trees and shrubs that appear within the ''Chute.''

It is impossible for us to set out all of the evidence of the respective parties in regard to the existence and nonexistence of

the island, and in regard to the manner in which the accretions were formed. Appellants produced witnesses who testified to their familiarity with the *locus in quo,* and who testified that a portion of the lands in question had at one time been an island, and that there was a stream of water flowing between the mainland and the island; that the channel of said stream called the "Iowa Chute" finally became closed at the upper or northern end; that thereafter, the island became connected with the mainland; and that, since said time, the water has flowed down the "Iowa Chute" only in times of high water.

Appellants produced witnesses who testified to their acquaintance with the locality for a number of years, some of whom had lived at one time upon the land described as an island, and who testified that there was a well defined stream of water that flowed down the so-called "Iowa Chute," and that this channel became closed at the north end by artificial means. One witness testified that he placed wire netting and logs across the "Iowa Chute" at the upper end, to prevent the waters of the river from flowing down the same.

On the other hand, there were a number of witnesses produced by the appellee, who had lived in the vicinity of the lands in controversy for many years, and were apparently thoroughly familiar with the location, who testified that there never was any island in the river, as claimed by witnesses for the appellants; that the course of the river next to the Iowa bank was uncertain; that there was a swale or depression in the accreted lands, which is referred to by the appellants as the "Iowa Chute;" that the same was not the bed of a flowing stream, nor part of the Missouri River; but that, in times of high water, the river overflowed these accreted lands, and passed down this swale or "Chute." There is also evidence that, in times of freshets, the water backed up into this depression or "Chute" from the south end. There is also testimony in behalf of the appellee to the effect that lying eastward from the "Iowa Chute" is what is known as the "Morrow Slough," that had an outlet into this "Iowa Chute;" and the presence of flowing water in the "Iowa Chute" is explained by appellee's witnesses on the theory that the same came from the Morrow Slough, instead of from the Missouri River.

The evidence is in direct conflict upon the question of the existence of the island. After a careful examination of it, we are constrained to believe that the lands in question were formed as accretions to the mainland, and not as partly accretions to the mainland and partly an island in the river and accretions thereto. Undoubtedly, during the quarter of a century or more since the river began to recede from its farthermost eastern location, the accreted lands have been more or less overflowed repeatedly. We are persuaded that the ''Iowa Chute'' has been formed by these flood waters from the Missouri River, rather than as a definite channel of a constantly flowing portion of the river. The general characteristics of the ''Iowa Chute,'' coupled with testimony of witnesses in connection with this matter, bring us to the conclusion that there was no well defined island, within the proper meaning of that term, which existed in the river bed and which was separated from the mainland by a definite body of water of the Missouri River, flowing continually therein. Unquestionably, the river has more or less frequently, especially in times of high water, flowed over these accreted lands down the ''Iowa Chute.'' This would account for the condition of the vegetation in the ''Chute,'' and for the preservation of a more or less well defined depression. The fact that water from the river may occasionally and periodically flow entirely around a portion of land does not necessarily make it an island. The cases cited supra sustain this conclusion.

We have given the case such consideration as its importance merits, and have read all of the evidence with care, and are persuaded that all the lands in question were properly held by the trial court to be accretions to the mainland, and that the appellee was entitled to a decree quieting his title in said premises.

It therefore follows that the decree of the district court must be, and the same is in all respects,—*Affirmed*.

EVANS, C. J., ARTHUR and DE GRAFF, JJ., concur.

STEVENS, J., took no part in decision.