Andrew PARKISON et al., Appellants–
Defendants,

v.

Richard G. and Mary E. McCUE,
Appellees–Plaintiffs,

and

Cynthia Lynn Dunlap, Appellee–
Defendant.

No. 76A03–0409–CV–408.

Court of Appeals of Indiana.

July 13, 2005.

Latriealle Wheat, Angola, for Appellants.

Timothy J. Abeska, Michael V. Knight, Barnes & Thornburg LLP, South Bend, for Appellee Cynthia Lynn Dunlap.

Robert T. Keen, Jr., Larry L. Barnard, Carson Boxberger LLP, Fort Wayne, for Appellees Richard G. and Mary E. McCue.

## OPINION

BAILEY, J.

### Case Summary

Appellants–Defendants Andrew Parkison, et al. (collectively "Parkison") appeal the trial court's order granting summary judgment in favor of Appellee–Defendant

Cynthia Lynn Dunlap ("Dunlap").[1] We affirm.

## Issues

Parkison raises two issues on appeal, which we reorder and restate as the following:

1) Whether the trial court abused its discretion in failing to default Dunlap; and

2) Whether the trial court erred in granting summary judgment in favor of Dunlap because the language of the easement is ambiguous.

Within our analysis of whether summary judgment was appropriate, we address two issues Dunlap raises in her cross-appeal, which we restate as:

1) Whether the trial court erred in finding that the original easement was not extinguished by flooding; and

2) Whether the Robison easement created an additional burden on Dunlap's property.

1. Richard G. and Mary E. McCue ("the McCues") are listed as Appellants–Defendants in the present action, and filed a brief concurring in the brief of Dunlap. However, we

## Facts and Procedural History

On August 23, 1923, Cyrus and Alice Kint ("the Kints") recorded the plat of Arcadia Beach, located in Steuben County along the shore of Clear Lake. This subdivision lies on the eastern shore of Clear Lake, and consists of approximately thirteen lakefront lots and sixty-two lots behind the lakefront lots that have no direct access to Clear Lake ("the back lots"). Currently, there are eighteen lots with lakefront access and approximately 83 owners of land in the Arcadia Beach subdivision.

The plat of Arcadia Beach included a roadway along the lakefront in front of the lakefront lots, and the boundaries of the lakefront lots extended to the midpoint of the roadway. In recording the Arcadia Beach subdivision, the Kints reserved the portion of land between the roadway and Clear Lake, which "is dedicated for the use of lot owners of Arcadia Beach and all additions." Appellant's App. at 133. This strip of land varied in width from three to twelve feet, as indicated below:

note that the McCues were previously defaulted by the trial court, a decision we affirmed in our memorandum decision, *McCue v. Krause*, 810 N.E.2d 783 (2004).

Appellee's Br. at 6.

From the time of the original dedication until sometime in the late 1930s, no piers were placed by any owners living in the Arcadia Beach subdivision. On March 11, 1933, the Board of Trustees of the Town of Clear Lake vacated the lakefront roadway, and title to the vacated portion of the roadway between the lakefront lots and the water apparently reverted to the Kints. The figure below indicates the section of the roadway vacated by the Town of Clear Lake:

Appellee's Br. at 7.

In 1969, Erma Kint, an heir to the Kints, quitclaimed her interest in the vacated roadway, i.e. the property extending from the midpoint of the roadway to Clear Lake, to Harry Robison. Erma reserved an easement for all owners of property in the Arcadia Beach subdivision "to ingress and egress over said property to the waters of Clear Lake and the unrestricted use of said property for recreation purposes." At that time, few owners of Arcadia Beach property placed piers along the easement, and those that did were primarily front lot owners. In 1970, Erma's brother, Vere, quitclaimed his interest in the same property to Robison, but did not include a reservation for the owners of Arcadia Beach.

In 1972, Robison quitclaimed his interest in a portion of Lot Number 3 between Clear Lake and Lot Number 3's western boundary to John Oberst.[2] Robison reserved an easement for all owners of property in the Arcadia Beach subdivision "to ingress and egress over said property to the waters of Clear Lake and the unrestricted use of said property for recreation purposes." Appellant's App. at 133. The Robison easement is depicted in the following figure:

---

2. Oberst simultaneously quitclaimed his interest back to Robison. It appears that Robison had title to the vacated roadway, and subdivided the property and transferred title to the lakefront owners adjacent to the respective subdivided tract.

Appellee's Br. at 9.

Recently, conflict has arisen over the appropriate use of the easement when back lot owners began placing piers along the easement. On September 5, 2000, the McCues, owners of one of the lake front lots, filed a complaint for ejectment and trespass against Anthony Kraus ("Kraus"), one of the back lot owners, to remove a pier Kraus had placed on the easement and prevent Kraus from entering onto the McCues' property. The McCues later amended their complaint to include all property owners in the Arcadia Beach subdivision, which included a claim to quiet title. On November 5, 2001, Parkison, a back lot owner, filed his answer, counter-claim, and cross-claim.

In 2002, Cynthia Dunlap received a personal representative's deed from Roger Robison, the personal representative of the estate of Herma Robison, Harry Robison's spouse, for the following real estate:

Lot Number three (3) and Fourteen (14) in Block 1, Plat of Arcadia Beach at Clear Lake as the same appears on record, in Clear Lake Township, Steuben County, Indiana.

Also,

Beginning at the Northwest corner of Lot Number three (3) in Section One (1) of Arcadia Beach, Clear Lake Township, Steuben County, Indiana, being and lying in Township 38 North, Range 15 East; running thence West on the extended North line of said Lot Number three (3) to the water of Clear Lake; thence Southerly along the water of Clear Lake to a point where the extended south line of Lot Number three (3) would intersect the water of Clear Lake; thence East on said extended South line to the Southwest corner of said Lot Numbered three (3); thence North across the West end of Lot number (3) to the Place of Beginning.

Appellant's App. at 367. Surveys conducted in 2002 and 2003 show that the original beach area between the vacated roadway and Clear Lake is currently underwater.

Lot 3 has approximately 43 feet of lake frontage.

In October of 2002, Dunlap appeared in the McCues' action and moved to substitute herself as a party in place of Herma Robison. On July 2, 2003, Parkison filed an application for default judgment because neither Herma Robison nor Dunlap had filed an answer to Parkison's cross-claim. Following a hearing, the trial court denied Parkison's motion and granted an extension of time for Dunlap to answer. On August 29, 2003, Dunlap filed an answer and a counter cross-claim and counter-claim against Parkison.

Dunlap and Parkison filed motions for summary judgment. On July 2, 2004, after conducting a hearing, the trial court entered the following order:

Pending before the Court for decision is the Motion for Partial Summary Judgment on the Counter–Claim and Cross–Claim filed by defendants represented by Latrialle Wheat and defendant Dunlap's Motion for Partial Summary Judgment. Being duly advised, findings are entered that no genuine issue of material fact exists that:

1) Defendant Dunlap owns in fee simple Lots 3 and 14, Block 1, Arcadia Beach Subdivision.

2) Defendant Dunlap's Lots 3 and 14 of Block 1 are not burdened by easements.

3) That defendant Dunlap owns in fee simple that area lying between Lot 3's north and south lot lines extended to Clear Lake.

4) That the aforesaid area is burdened by an easement from three (3) sources:

a) The Cyrus and Alice Kint plat of Arcadia Beach in 1923;

b) The Erma Kint easement by Quit–Claim Deed to Harry Robison in 1969.

c) The Robison/Oberst easement by Quit–Claim Deed from Harry and Herma L. Robison to John Oberst in 1972.

5) That the easement created, by whatever source, was not terminated by flooding.

6) That the easement was not terminated by prescription.

7) The scope of the easement conferred whether by plat or by Deed, by its plain language, does not permit the construction of a pier, boatlift or other structure on the easement. Any installation of a pier, boatlift or other structure or the storage of any pier, boatlift or boat, if by a dominant holder of the easement, would be an unlawful expansion of the easement.

8) That the easement is for ingress and egress to the lake.

9) Once at the lake, the easement holders are entitled to use the lake for unrestricted recreational purposes. Recreational purposes, as defined by I.C. [§ ]14–26–2–5, include fishing, boating, swimming and any other purpose for which lakes are ordinarily used and adapted. The statute expressly does not confer any authority to construct a pier or other structure.

10) There is no just cause for delay. This is a final and appealable judgment.

Appellant's App. at 24–25. Parkison filed a motion to correct error, which the trial court denied. This appeal ensued.

### Discussion and Decision

*I. Denial of Motion for Default*

■■■ Parkison first argues that the trial court abused its discretion by denying

Parkison's motion for default. In general, default judgments are not favored in Indiana. *Young v. Elkhart County Office of Family & Children*, 704 N.E.2d 1065, 1068 (Ind.Ct.App.1999). The grant or denial of a motion for default judgment is committed to the trial court's sound discretion. *Kelly v. Bennett*, 732 N.E.2d 859, 861 (Ind.Ct.App.2000). We will reverse such a ruling on appeal only if the decision is clearly against the logic and effect of the facts and circumstances. *Id.*

■ Parkison argues that the trial court abused its discretion in denying his application for default judgment against Dunlap. Parkison claims that because Dunlap had not filed an answer to his counterclaim and cross-claim, which was filed 597 days prior to the motion for default and 253 days following her motion for substitution of party was granted, Parkison is entitled to a default judgment. Parkison also argues that Dunlap failed to show excusable neglect in failing to file an answer under Indiana Trial Rule 6(B), and thus the trial court abused its discretion in allowing Dunlap to file a belated answer.

Indiana Trial Rule 55, which governs default judgments, provides:

(A) Entry. When a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise comply with these rules and that fact is made to appear by affidavit or otherwise, the party may be defaulted.

(B) Default judgment. In all cases the party entitled to a judgment by default shall apply to the court therefor; but no judgment by default shall be entered against a person known to be an infant or incompetent unless represented in the action by a general guardian, committee, conservator, or other such representative who has appeared therein. If the party against whom judgment by default is sought has appeared in the action, he (or, if appearing by a representative, his representative) shall be served with written notice of the application for judgment at least three [3] days prior to the hearing on such application. If, in order to enable the court to enter judgment or to carry it into effect, it is necessary to take an account or to determine the amount of damages or to establish the truth of any averment by evidence or to make an investigation of any other matter, the court may conduct such hearing or order such references as it deems necessary and proper and shall accord a right of trial by jury to the parties when and as required.

Moreover, Indiana Trial Rule 6(B) provides:

Enlargement. When an act is required or allowed to be done at or within a specific time by these rules, the court may at any time for cause shown:

(1) order the period enlarged, with or without motion or notice, if request therefor is made before the expiration of the period originally prescribed or extended by a previous order; or

(2) upon motion made after the expiration of the specific period, permit the act to be done where the failure to act was the result of excusable neglect; but, the court may not extend the time for taking any action for judgment on the evidence under Rule 50(A), amendment of findings and judgment under Rule 52(B), to correct errors under Rule 59(C), statement in opposition to motion to correct error under Rule 59(E), or to obtain relief from final judgment under Rule 60(B), except to the extent and under the conditions stated in those rules.

Here, the evidence shows that by the time Dunlap had substituted herself for Robison, the time to respond to Parkison's counterclaims and crossclaims had already

expired. At the hearing on Parkison's application for default, Dunlap's counsel indicated that he had just been appointed. Further, Dunlap explained that the original action by the McCues was not adverse to Robison, and Dunlap did not believe that the cross-complaints and counter-claims were adverse to Robison's interest, or Dunlap's interest following her substitution. Although Dunlap did not file an answer until more than nine months after she entered into the litigation, Parkison did not show how he was prejudiced by the delay. Given these circumstances, and the overarching preference to resolve claims on their merits, we cannot say the trial court's denial of Parkison's application for default and order granting Dunlap an extension to file an answer constituted an abuse of discretion.

## II. Summary Judgment

### A. Standard of Review

Pursuant to Rule 56(C) of the Indiana Rules of Trial Procedure, summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. When reviewing a grant of summary judgment, this Court applies the same standard as the trial court. *Best Homes, Inc. v. Rainwater,* 714 N.E.2d 702, 705 (Ind.Ct.App.1999). We must determine whether there is a genuine issue of material fact requiring trial, and whether the moving party is entitled to judgment as a matter of law. *Id.* Neither the trial court nor the reviewing court may look beyond the evidence specifically designated to the trial court. *Id.*

A party seeking summary judgment bears the burden to make a prima facie showing that there are no genuine issues of material fact and that the party is entitled to judgment as a matter of law. *Am. Mgmt., Inc. v. MIF Realty L.P.,* 666 N.E.2d 424, 428 (Ind.Ct.App.1996). Once the moving party satisfies this burden through evidence designated to the trial court pursuant to Trial Rule 56, the non-moving party may not rest on its pleadings, but must designate specific facts demonstrating the existence of a genuine issue for trial. *Id.* Further, the fact that the parties have made cross-motions for summary judgment does not alter our standard of review. *Metal Working Lubricants Co. v. Indianapolis Water Co.,* 746 N.E.2d 352, 355 (Ind.Ct.App.2001). Rather, we consider each motion to determine whether the moving party is entitled to judgment as a matter of law. *Id.*

Finally, we note that the trial court entered findings of fact and conclusions thereon in its order granting summary judgment. While such findings and conclusions are helpful in clarifying the trial court's rationale, they are not binding on this Court. *Foxworthy v. Heartland Co-Op.,* 750 N.E.2d 438, 441 (Ind.Ct.App. 2001).

### B. Analysis

Parkison argues that the trial court erred in granting summary judgment in favor of Dunlap. Parkison contends that the language in the deed granting an easement was ambiguous concerning the grantor's intent to allow dominant easement holders the right to attach a dock to the easement. In response, Dunlap argues that Parkison has waived his claim that the language is ambiguous because he argued to the trial court that it was not. In any event, Dunlap responds that the language is not ambiguous, but further contends in her cross appeal that the trial court erred in finding that the original easement had not been extinguished because the original easement is now below the water line of Clear Lake. Further, Dunlap argues that the easement purportedly created by Erma Kint was invalid because Erma Kint

held tenancy in common with her brother, who did not burden the land with an easement when he quitclaimed it to Robison.

■■■ The object of deed interpretation is to identify and implement the intent of the parties to the transaction as expressed in the plain language of the deed. *Keene v. Elkhart Co. Park & Recreation Bd.*, 740 N.E.2d 893, 897 (Ind.Ct.App.2000), *reh'g denied*. We read the language of real covenants in the ordinary and popular sense, and not in a technical or legal sense. *Id.* If the terms of the deed are not ambiguous, we apply them according to their clear and ordinary meaning. *Id.* We presume that the parties intended for every part of a deed to have some meaning, and we favor a construction that reconciles and harmonizes the entire deed. *Id.*

■■■ Generally, a property owner whose property abuts a lake, river, or stream possesses certain riparian rights associated with ownership of such a property.[3] The rights associated with riparian ownership generally include: (1) the right of access to navigable water; (2) the right to build a pier out to the line of navigability; (3) the right to accretions; and (4) the right to a reasonable use of the water for general purposes such as boating, domestic use, etc. *Tennant v. Recreation Dev.*

*Corp.*, 72 Mich.App. 183, 186, 249 N.W.2d 348, 349 (1976) (citing *Hilt v. Weber*, 252 Mich. 198, 225, 233 N.W. 159 (1930)).

■■■ Easements burdening land with riparian rights attached do not necessarily provide the easement holder use of these riparian rights. *Brown v. Heidersbach*, 172 Ind.App. 434, 441, 360 N.E.2d 614, 619–20 (1977). Instead, we first look to the express language of the easement. *Klotz v. Horn*, 558 N.E.2d 1096, 1097–98 (Ind. 1990). "An instrument creating an easement must be construed according to the intention of the parties, as ascertained from all facts and circumstances, and from an examination of all its material parts." *Brown*, 172 Ind.App. at 441, 360 N.E.2d at 620. Courts may resort to extrinsic evidence to ascertain the intent of the grantors creating the easement only where the language establishing the easement is ambiguous. *Gunderson v. Rondinelli*, 677 N.E.2d 601, 603 (Ind.Ct.App.1997) (citing *Klotz*, 558 N.E.2d at 1098). A deed is ambiguous if it is susceptible to more than one interpretation and reasonably intelligent persons would honestly differ as to its meaning. *See Abbey Villas Dev. Corp. v. Site Contractors, Inc.*, 716 N.E.2d 91, 100 (Ind.Ct.App.1999), *trans. denied.*

---

**3.** Property rights associated with rivers and streams are known as riparian rights, whereas property rights associated with lakes and ponds are termed littoral rights. *Abbs v. Town of Syracuse*, 655 N.E.2d 114, 115 n. 1 (Ind.Ct.App.1995), *trans. denied*. "Riparian" comes from the Latin term *ripa*, meaning the bank of a stream, whereas "littoral" is derived from the Latin *litus*, meaning a shore. ROBERT E. BECK, WATERS AND WATER RIGHTS § 6.02(b) at 6–99 (2001). However, as many jurisdictions use the term "riparian" to identify both classes of property, we use the term "riparian" here. *See id.* § 6.02(b), at 6–100; *see also Abbs*, 655 N.E.2d at 115 n. 1. In fact, the term "riparian rights" is now generally applied to both riparian and littoral

rights. BECK, *supra*, § 6.02(b), at 6–100. Maine is one of the few states that still recognizes a distinction between littoral and riparian rights, and the difference between the two involves, in part, the riparian owner's ability to use the water from a river or stream as long as it does not unreasonably affect downstream riparian owners, whereas littoral owners may not draw down lake levels below the natural low-water mark, or discharge into the lake so that the water rises above the natural high-water mark. Bradford Bowman, *Instream Flow Regulation: Plugging the Holes in Maine's Water Law*, 54 ME. L. REV. 287, 295 n. 59 (2002) (citing *In re Opinions of the Justices*, 118 Me. 523, 106 A. 865, 868–69 (1919)).

Here, the trial court determined that the plain language contained in the original deed to the Arcadia Beach plat, and the subsequent language in the quitclaim deeds, did not convey dominant easement tenants the right to construct or maintain a pier on the easement.

Initially, Dunlap argues that Parkison is judicially estopped from arguing that the deed language was ambiguous because Parkison consistently argued before the trial court that the deed language was not ambiguous. Indeed, even in his reply brief, Parkison continues to argue that "the easement documents, as a matter of law, give pier rights with the reference to unrestricted use for recreation purposes. If that argument does not prevail, there still is no genuine issue of material fact." Reply Br. at 13.

■ A party may not argue to the trial court one theory, and then argue on appeal an alternate theory. *Bennett v. CrownLife Ins. Co.*, 776 N.E.2d 1264, 1268 (Ind.Ct. App.2002). Upon reviewing Parkison's summary judgment motions and responses filed with the trial court, we believe a fair reading of Parkison's argument is that: (1) the easement language unambiguously provides for pier rights, or in the alternative; (2) if the language is ambiguous, the designated evidence shows that the intent of the grantors was to provide for pier rights. Accordingly, we decline to find that Parkison has waived his argument.

Turning to the language of the easements, we must first determine whether the language is unambiguous. If so, we need not look beyond the plain language of the deed conferring the easement to determine the intent of the grantor at the time the easement was created. *See Klotz,* 558 N.E.2d at 1098 (holding that because the phrase "access to Eagle Lake" was ambiguous, trial court should allow extrinsic evidence to determine grantor's intent).

■ We note that there are three separate easements involved in this case: the original Kint dedication of Arcadia Beach, i.e., "for the use of lot owners of Arcadia Beach and all additions;" the easement contained in Erma Kint's quitclaim deed to Robison; and Robison's quitclaim deed to Oberst. We address only two of these easements: the original dedication and Robison's quitclaim.[4]

### 1. The Original Dedication

The original dedication of Arcadia Beach reserved the strip of land between the roadway and Clear Lake "for the use of lot owners of Arcadia Beach and all additions." Parkison argues that this language is ambiguous, and thus, the trial court erred in granting summary judgment. Dunlap contends that this easement no longer has any legal consequence because it is underwater. We find the resolution of this issue dispositive.

The trial court found that the original dedication "was not terminated by flooding." We begin our examination of the issue by determining whether the original dedication is underwater due to flooding, or due to a long-term change in the water level of Clear Lake. "Flood" is defined as

---

4. We do not address the Erma Kint easement, which Erma Kint created in her quitclaim deed to Robison while she held tenancy in common with her brother Vere. As a co-tenant, Erma Kint could not grant an easement or confer any right that could be enforced against another co-owner. *See* THOMPSON ON REAL PROPERTY, § 317 at 28 (1980). Accordingly, Erma could only quitclaim the title she had authority to convey, which was her fee simple interest held in common with Vere. It was only when Robison obtained title from both co-tenants that he had the right to burden the estate with an easement, which we address *infra.*

"a rising and overflowing of a body of water that covers land not usu. under water." WEBSTER'S THIRD NEW INT'L DICTIONARY, 873 (2002). Accordingly, we view flooding as a temporary condition that subsides as water levels recede. *See* Ind.Code § 13–11–2–64 (defining "Emergency" as "the occurrence of widespread or severe damage or loss of property resulting from any natural or manmade cause, including fire, flood, earthquake, wind, storm, drought, or explosion.")

Here, Dunlap designated two surveys that indicated the original lakeside easement is currently underwater, apparently due to rising water levels in Clear Lake, and has been so since 2002. Accordingly, this is not a temporary condition. Parkison argues that even though the easement is underwater, back lot owners may still enjoy walking in the shallow water now covering the original dedication. Further, Parkison posits that the waters may recede in the future, and thus, the easement would once again be above water and available for use by back lot owners.

■ With respect to Parkison's first contention, while we agree that back lot owners may enjoy walking in the water along the shoreline, the right to do so no longer originates from the dedication, but rather under Indiana statute. Under Indiana Code Section 14–26–2–5, citizens may enjoy public waters for recreational purposes. As a public lake, the State of Indiana holds title to Clear Lake, and riparian owners do not have an exclusive right to any part of the lake. *Id.* Accordingly, the right of back lot owners to walk in the shallow waters of Clear Lake is the same right as any citizen.

■ With respect to Parkison's claim that the dedication is not extinguished, our independent research found no Indiana case on point. Other jurisdictions, however, have addressed whether a fee holder regains his title after his original land has eroded away and then reappears through accretion.[5]

In *Smith v. Bruce*, 241 Ga. 133, 244 S.E.2d 559 (1978), the Georgia Supreme Court addressed this issue, and determined that a beach easement dedicated for public use may be lost through gradual erosion. " 'When water so far encroaches on land that a tract which was formerly riparian is completely submerged or washed away and land formerly non-riparian becomes riparian, subsequent accretions belong to the owner of the tract newly made riparian even though such accretions in time extend over the area formerly owned by an adjoining, and the original riparian owner. . . .' " *Id.*, 244 S.E.2d at 569–570 (quoting 4 TIFFANY, LAW OF REAL PROPERTY § 1224).

Similarly, in *Payne v. Hall*, 192 Iowa 780, 185 N.W. 912 (1921), the Iowa Supreme Court held that "[w]here lands are overflowed and submerged, and within a reasonable time the waters retire and the land reappears, the title of the owner is not disturbed, and the proprietorship remains in the original owner." *Id.*, 192 Iowa 780, 185 N.W. at 914. However, "[w]here the lands of a riparian owner are removed by the gradual process of erosion by the river, the land no longer capable of identification, but having been carried away entirely, and the river occupies the identical space formerly occupied by the lands of the riparian owner, the title to the land so occupied by the bed of the river

---

**5.** Accretion is the process of a gradual and imperceptible increase in land caused by the deposit of earth, sand, or sediment by contiguous waters and has been held to be a source of title. *Longabaugh v. Johnson*, 163 Ind.App. 108, 110, 321 N.E.2d 865, 867 (1975), *reh'g denied.*

passes from the owner of the land to the state. This is one of the necessary incidents of riparian ownership." *Id.*, 192 Iowa 780, 185 N.W. at 914. Further, "[i]t also appears to be the law that, where the lands of a riparian owner have been slowly and gradually eroded by a navigable stream, and the river has usurped and taken up the location of said land, the riparian owner of the land at the newly formed river bank becomes entitled to the accretions that may thereafter be formed against said bank, even though they should extend over the same territory where lands of a former riparian owner had been located before the erosion took place." *Id.*, 192 Iowa 780, 185 N.W. at 915.

We find the holdings of *Smith* and *Payne* to be persuasive as applied to the facts presented in this case. Here, the land previously dedicated as the original beach easement is underwater, and thus, title to this land has shifted from the riparian owner, i.e., Dunlap, to the State. Upon losing title to the beach, any easement burdening the titleholder as to the beach is no longer in existence. In the event the level of Clear Lake recedes, any future accretions are owned by Dunlap, and are not burdened by the extinguished easement. *See Longabaugh*, 163 Ind.App. at 110, 321 N.E.2d at 867 (holding that because a riparian owner is without a remedy for his loss due to erosion, he cannot be held accountable for his gain through accretion).

**6.** Robison's quitclaim contained identical language to Erma Kint's quitclaim, except that Erma Kint's quitclaim included the following language: "the interests conveyed *herein* ...." As discussed *supra*, we only address Robison's quitclaim.

**7.** Both parties agree that the easement created by the Robison quitclaim includes a greater area of property than that which was included in the easement created by the Erma Kint quitclaim. However, it is unclear

### 2. *The Harry Robison Quitclaim*

Robison's quitclaim included the following language: [6]

PROVIDED, HOWEVER, that the interests conveyed shall forever be subject to a reservation in all of the owners of *property encompassed* in the said Plat of Arcadia Beach at Clear Lake to ingress and egress over *said property* to the waters of Clear Lake and the unrestricted use of *said property* for recreation purposes.

Appellant's App. at 365 (emphasis added). Dunlap argues that the easement language in Robison's quitclaim deed to Oberst did not establish a new burden on the land, but merely restated the original dedication of Arcadia Beach.[7]

Dunlap contends that because the term "said property" follows the term "property encompassed," Robison only intended to note the original Arcadia Beach reservation. However, Robison included additional language not found in the original grant, i.e., the "unrestricted use" of "said property" for "recreation purposes." Accordingly, the plain language of the grant creates a burden on a portion of the roadway previously vacated by the Town of Clear Lake.

In *Metcalf v. Houk*, 644 N.E.2d 597 (Ind.Ct.App.1994), we considered similar language in a lakeside easement and concluded that a deed that granted an ease-

whether the northwest corner of lot 3, i.e., Dunlap's property, is located as shown on the original plat or extended to the center of the vacated roadway, as the centerline of the vacated roadway contained surveyor's monuments. Appellant's App. at 216. The trial court did not examine this issue, and as neither party raises any issue concerning the boundaries of the easement, we do not address this issue.

ment for "ingress and egress" to reach Lake James was ambiguous. Similarly, in *Klotz*, our Supreme Court determined that language creating an easement for "access to Eagle Lake" was ambiguous. In each case, it was noted that generally, " 'access to a body of water is sought for particular purposes beyond merely reaching the water, and where such purposes are not plainly indicated, a court may resort to extrinsic evidence to assist the court in ascertaining what they may have been.' " *Klotz*, 558 N.E.2d at 1098; *Metcalf*, 644 N.E.2d at 600 (quoting *Badger v. Hill*, 404 A.2d 222, 226 (Me.1979)). However, in both cases, the easements consisted of a narrow strip of land running through or alongside the servient estate *to* the body of water.

In this case, the lakeside easement is parallel to the lakeshore frontage of the servient estate, *along* the shore of Clear Lake, a key fact that distinguishes this case from *Metcalf* and *Klotz*. Further, our opinion in *Brown* is helpful. In *Brown*, we determined that upon considering all of the facts and circumstances surrounding the easement and an examination of the material parts of the deed, the *express* terms of "an easement to the shore of Lake George" over Kopekanee Beach "to be used in common with other lot owners" did not provide the easement titleholders with riparian rights, such as the right to maintain a pier. *Brown*, 172 Ind.App. at 435–36, 360 N.E.2d at 616. Although the easement was similar to those in *Klotz* and *Metcalf*, in that it went across the servient estate to the shore of Lake George, we determined that because the easement led to a beach, placement of a pier by other dominant easement-holders would "severely limit Brown's riparian rights as owners of the fee." *Id.* at 441, 360 N.E.2d at 620. Our Supreme Court agreed with *Brown* in *Klotz*, noting that the availability of a beach distinguished *Brown* from the facts in *Klotz*, where the evidence indicated that the easement holders could not enjoy the easement without a dock or pier. *Klotz*, 558 N.E.2d at 1099.

■ As in *Brown*, allowing back lot owners to place piers on the lakeshore easement would severely limit Dunlap's riparian rights as the fee owner. If all 83 owners placed piers along the 40 feet of Dunlap's lake frontage, the midpoint of each pier would be closer than one foot apart. We remind back lot owners that their use of the easement must not interfere with Dunlap's own use of the easement, separate and apart from her riparian rights, as an owner of property encompassed in said plat of Arcadia Beach at Clear Lake.

■ Further, pier placement by some back lot owners would limit other back lot owners from enjoying the lakefront. "[A]n owner in common of an easement may not alter or use the land in such a manner as to render the easement appreciably less convenient and useful for other co-owners." *Metcalf*, 644 N.E.2d at 601. The placement of piers along the lakeshore by some easement holders would physically restrict other co-owners from using the lakeside easement in a manner consistent with the express language of the easement. Parkison argues that the docks are non-exclusive, and may be used by other easement-holders. This does not, however, alleviate the physical restrictions that such pier placement would have on the ability of other easement holders to use the beach, or the servient tenants to utilize their riparian rights.

The trial court also found that from the lakefront easement, dominant easement holders may utilize the lake for recreational purposes such as swimming, fishing, and boating pursuant to Indiana Code Section 14–26–2–5. Dunlap argues that by finding that back lot owners may use the easement for recreational purposes under Indiana

Code Section 14–26–2–5, the trial court merely provided back lot owners permission to do what the statute provides, and thus, the easement no longer serves any purpose. We disagree. While the rights may be the same as those provided by statute, the easement provides back lot owners a particular location from which to engage in recreational activities. Accordingly, back lot owners may walk along the easement and engage in the specified recreational purposes from the easement.

Nevertheless, based upon our determination that the Erma Kint easement was a nullity and that the original beach dedication has been extinguished, back lot owners may face difficulty in accessing the easement on Dunlap's property without trespassing across other front lot owners' properties. We note that Robison did not create similar easements when he quitclaimed his interest in the roadway easement and beachfront to the lake front owners adjacent to Dunlap's property. These quitclaims were executed in 1970, two years prior to the Robison quitclaim that created the easement on Dunlap's property. As we previously addressed, any access to the Robison easement, via the beach, has since been extinguished. Thus, to some extent, the purpose of the Robison easement is frustrated. However, there is not a complete frustration of purpose as access to the easement is possible by water.

Finally, to the extent "boating" is a recreational purpose, back lot owners may bring boats to the shore, but may not otherwise store boats on the easement or moor them in a manner that interferes with Dunlap's riparian rights. *Cf. Zapffe v. Srbeny*, 587 N.E.2d 177, 181 (Ind.Ct. App.1992) (holding that riparian tract extended into lake by fifty feet, but owner did not have standing to enforce statutes limiting mooring devices when devices were located beyond the fifty-foot boundary). Moreover, placement of piers or docks is not a "recreational purpose" enunciated in Indiana Code Section 14–26–2–5. While the availability of a pier may allow back lot owners, and perhaps more specifically, back lot owners with boats, jet skis, and the like, more convenient access to the lake, nothing in the record designated by the parties indicates that the absence of piers along the easement for use by back lot owners restricts the back lot owners' use of the easement.[8]

Given the unique easement in this case, the trial court correctly determined that the express easement language did not provide dominant easement holders a right to place a pier as a matter of law. Accordingly, the trial court did not err in finding that the easement allowing "ingress and egress over said property to the waters of Clear Lake and the unrestricted use of said property for recreation purposes" did not provide easement holders the right to install or maintain piers.

### Conclusion

For the foregoing reasons, we affirm the trial court's grant of summary judgment.

Affirmed.

FRIEDLANDER, J., and ROBB, J., concur.

---

8. A non-exclusive dock located south of Dunlap's property is available for back lot owners' use. The record does not indicate the authority for the dock's placement, and the appropriateness of the common pier is not an issue before us.