**DAISY FARM LIMITED PARTNERSHIP, Appellant–Plaintiff,**

v.

**Michael MORROLF and Jill Morrolf, Appellees–Defendants.**

**No. 43A04–0707–CV–390.**

Court of Appeals of Indiana.

May 16, 2008.

Rehearing Denied July 18, 2008.

Michael A. Wilkins, Brian J. Paul, Jenny R. Wright, Indianapolis, IN, Attorneys for Appellant.

Stephen R. Snyder, Randall L. Morgan, Syracuse, IN, Attorneys for Appellees.

## OPINION

HOFFMAN, Senior Judge.

Plaintiff–Appellant Daisy Farm Limited Partnership ("Daisy Farm") appeals the trial court's judgment in favor of Defendants–Appellees Michael Morrolf and Jill Morrolf (the "Morrolfs"). We reverse and remand with instructions.

Daisy Farm raises two issues for our review, which we restate as:

I. Whether the trial court erred as a matter of law in determining riparian boundaries.

II. Whether the trial court erred in determining that a disputed tract did not pass to Daisy Farm by virtue of adverse possession.[1]

---

1. We note that the Morrolfs argue that the trial court determined that Daisy Farm failed to present the court with a proper legal description of the property sought through ad-

Daisy Farm and the Morrolfs own adjoining lots of land in Cripplegate Heights, a neighborhood located at the south end of Lake Tippecanoe in Kosciusko County, Indiana. Daisy Farm owns Lot 12. Immediately to the east of Lot 12 is the Morrolfs' property, Lot 13. The property lines of Lots 12 and 13 meet Tippecanoe Lake at an angle. Both Daisy Farm and the Morrolfs have cottages on their lots overlooking the lake to the north, and both maintain piers extending from their property out into the lake.

Each lot has approximately thirty-three feet of frontage along the lake, and a long sidewalk and grassy area known as "Lake Boulevard" runs across both properties between the cottages and the lake by virtue of a thirty-foot-wide public easement. Also, subsequent to the recording of the original plat for Cripplegate Heights in 1903, lot owners added fill to the area north of Lake Boulevard and thus created a new tract of land outside the boundaries of the plat of Cripplegate Heights. On December 31, 1938, the Kosciusko Circuit Court entered a judgment ("1938 Judgment") confirming the rights of the public over Lake Boulevard and declaring an easement over and across the new tract of land in favor of lot owners in Cripplegate Heights. Thus, both Daisy Farm and the Morrolfs acquired title expressly subject to "easements of the General Public and Lake Boulevard." (Finding of Fact # 3; Appellant's App. at 8). Concrete sidewalks run on either side of Lot 12 and "T" into Lake Boulevard. A sea wall is built between Lake Boulevard and the new tract of land.

On February 21, 2002, Gary and Annitra Chappell, Daisy Farm's predecessors in interest to Lot 12, brought suit against the Morrolfs to quiet title in the lot. When the Chappells sold Lot 12 to Daisy Farm in May 2003, Daisy Farm was substituted for the Chappells in the litigation.

After a bench trial, the trial court entered findings of fact and conclusions of law in support of its determination that (1) the parties' riparian rights are consistent with the lots' property lines, and (2) Daisy Farm failed to show that it acquired a portion of Lot 13 by adverse possession.

■ When reviewing claims tried without a jury, "the findings and judgment are not to be set aside unless clearly erroneous, and due regard is to be given to the trial court's ability to assess the credibility of witnesses." *Fraley v. Minger*, 829 N.E.2d 476, 482 (Ind.2005). A trial court's judgment is clearly erroneous "when there is no evidence supporting the findings or the findings fail to support the judgment .... and when the trial court applies the wrong legal standard to properly found facts." *Id.* (internal citations and quotations omitted). Although findings of fact are reviewed for clear error, appellate courts pay no deference to a trial court's conclusions of law, reviewing those de novo. *Id.* Cases that present mixed issues of fact and law are reviewed under the abuse of discretion standard. *Id.* If a trial court mischaracterizes findings as conclusions or vice versa, a court of review will "look past these labels to the substance of the judgment." *Id.*

I.

■ The first issue before this court is whether the trial court erred in determining the riparian boundaries of Lots 12

verse possession. In support of this argument, the Morrolfs' cite to an unsigned memorandum included in the Appellant's App., which appears to have been submitted by the Morrolfs to the trial court along with their proposed findings. This unsigned memorandum is not part of the trial court's signed order.

and 13. As a general rule, a property owner whose property abuts a lake, river, or stream possesses certain riparian rights associated with ownership of such a property. *Parkison v. McCue,* 831 N.E.2d 118, 128 (Ind.Ct.App.2005), *trans. denied; see also Brown v. Heidersbach,* 172 Ind.App. 434, 360 N.E.2d 614, 619 (1977) (holding that a riparian owner acquires his rights to the water from his fee title to the shore land). The term "riparian rights" indicates a bundle of rights that turn on the physical relationship of a body of water to the land abutting it. *Center Townhouse Corp. v. City of Mishawaka,* 882 N.E.2d 762 (Ind.Ct.App.2008), *trans. pending* (citing ROBERT E. BECK, WATERS AND WATER RIGHTS § 6.01(a) (2001)). Riparian rights are special rights pertaining to the use of water in a waterway adjoining the owner's property. *Id.* (citing 78 Am.Jur.2d *Waters* § 30 (2002)). Riparian owners may exercise rights such as access, swimming, fishing, bathing and boating. *Zapffe v. Srbeny,* 587 N.E.2d 177, 181 (Ind. Ct.App.1992), *trans. denied.* The installation of a pier by a riparian owner is a reasonable use. *Id.* It is the position of the Morrolfs' pier that occasions this appeal of the trial court's determination of the parties' riparian boundaries, as Daisy Farm contends that the positioning of Morrolfs' pier interferes with Daisy Farm's use of its own pier and mars its view of the lake by forcing Daisy Farm to view the Morrolfs' pier instead of its own pier.

Daisy Farm specifically contends that the trial court erred as a matter of law in not concluding that the riparian boundaries of Lots 12 and 13 were to be determined by extending the property lines into the lake at a ninety-degree angle from the point where they meet the shoreline (the "right angle method").[2] Daisy Farm argues that the method used by the trial court of continuing the property lines straight out into the lake (the "straight extension method") is improper under the circumstances of this case.

Daisy Farm cites *Bath v. Courts,* 459 N.E.2d 72 (Ind.Ct.App.1984), where this court adopted the reasoning of the Wisconsin Court of Appeals in *Nosek v. Stryker,* 103 Wis.2d 633, 309 N.W.2d 868 (App.1981) for determining the riparian rights of properties with shoreline boundaries where property lines meet the shoreline at right angles. In *Bath,* we held that the straight extension method was proper. Daisy Farm points out that in *Nosek* the Wisconsin court also outlined the right angle method as the proper approach where, as in the present case, the property lines meet the shoreline at acute or obtuse angles.

Daisy Farm's argument must fail. Although in *Bath* we did apply the straight extension method as that method was described in *Nosek,* we did not "adopt" the right angle method described in *dicta* by the Wisconsin court. Thus, although the trial court was free to apply the right angle method in the present case, it was not required to do so as a matter of law.

The rule in Indiana is that riparian owners are permitted "to maintain a pier so long as it does not interfere with rightful uses of the lake by others." *Bath,* 459 N.E.2d at 76. In the present case, the trial court made the following pertinent findings:

24. Piers connected with Lots 12–22 in Cripplegate Heights have histori-

---

2. The Morrolfs contend that Daisy Farm invited error on this issue because it argued that either its understanding of the historical property lines or the "right angle method" would apply here. In this case, we do not believe that the use of alternative arguments constitutes an invitation of error. *See e.g., Parkison,* 831 N.E.2d at 129.

cally been placed between the platted lot lines as hypothetically extended into Tippecanoe Lake.

25. The typical single-family pier structures and watercraft uses by the owners of Lots 12–22 in Cripplegate Heights may be adequately accommodated by a 33–foot wide riparian area located between the platted lot lines as hypothetically extended into Tippecanoe Lake.

(Appellant's App. at 14).

Our review of the appellate briefs and the record discloses that Daisy Farm does not challenge the trial court's findings of fact and that there is evidence to support the trial court's finding that pier structures and watercraft uses may be adequately accommodated by the 33–foot wide riparian area resulting from the hypothetical extension of platted lot lines into Tippecanoe Lake. For example, one long-time resident acknowledged that all lot owners would "have room to put 22 or 23 feet of width for two boats and a dock if they did it within the lines of both lots as shown on the Plat extended into the water[.]" Transcript at 244. Indeed, it appears that any interference with riparian uses by Cripplegate owners was occasioned by the failure of some lot owners to place their piers within the aforementioned extension of platted lot lines.

In summary, we hold that while the application of the right angle approach may have established a bright line rule that would have been easier to apply, such application is not mandated by our holding in *Bath*. We further hold that the trial court's extension of platted lot lines approach, if enforced, will permit each riparian owner on Lake Tippecanoe to enjoy rightful use of the lake without interference from a neighbor's pier.[3]

## II.

█ Daisy Farm contends that the trial court erred in determining that Daisy Farm and previous owners of Lot 12 had not acquired by adverse possession a narrow, triangular area located in the platted lines of Lot 13 that begins between the cottages and runs north to the lake. Daisy Farm argues that previous owners acquired ownership of the disputed tract of land by adverse possession as early as 1976. Daisy Farm further argues that the trial court should have concluded that the "line of possession" established by the historical treatment of the property line by the owners—not the platted lot line—defines the boundary between Lots 12 and 13.

Our supreme court has held that clear and convincing proof of the following entitle a person to acquire property by adverse possession:

(1) Control—The claimant must exercise a degree of use and control over the parcel that is normal and customary considering the characteristics of the land (reflecting the former elements of "actual," and in some ways "exclusive," possession);

(2) Intent—The claimant must demonstrate intent to claim full ownership of the tract superior to the rights of all others, particularly the legal owner (reflecting the former elements of

---

**3.** We have recently held in an inverse condemnation case that Indiana courts do not recognize a riparian right to an unobstructed view of the water, expressing our view that such a determination is best left to other branches of government. *Center Townhouse,*

882 N.E.2d at 771–72. We note that if the trial court's determination is strictly enforced it is not clear whether Daisy Farm will be compelled to view the Morrolfs' pier, and in any event, we hold that the *Center Townhouse* reasoning applies to the facts of this case.

"claim of right," "exclusive," "hostile," and "adverse");

(3) Notice—The claimant's actions with respect to the land must be sufficient to give actual or constructive notice to the legal owner of the claimant's intent and exclusive control (reflecting the former "visible," "open," "notorious," and in some ways the "hostile," elements);

(4) Duration—the claimant must satisfy each of these elements continuously for the required period of time (reflecting the former "continuous" element).

*Fraley*, 829 N.E.2d at 486.

Here, the trial court made the following findings in support of its conclusion that Daisy Farm failed to establish its adverse possession claim:

19. The testimony and other evidence introduced at trial that the real estate north of Lots 12 through 33 in Cripplegate Heights as extended to the water's edge of Tippecanoe Lake was historically used since at least 1951 in a non-exclusive manner by adults and children alike, including recreational uses across such real estate along the sidewalk and land north of the sidewalk on Lake Boulevard, the beach areas along the shore of Tippecanoe Lake, and the piers placed at the shore of Tippecanoe Lake.

20. A lakefront resident since 1951 testified in detail as to the non-exclusive uses over time without restrictions by the general public, including the other lakefront and non-lakefront residents in Cripplegate Heights, across all of the real estate comprising Lake Boulevard and north of Lake Boulevard to the water's edge of Tippecanoe Lake.

21. A non-lakefront resident in Cripplegate Heights since 1973 testified that she routinely accessed that area north of Lots 12–33 in Cripplegate Heights as extended to the water's edge of Tippecanoe Lake and observed over time the uses of such real estate by the public. With respect to that portion of Daisy Farm and Morrolf Real Estate north of Lots 12 and 13 as extended to the water's edge of Tippecanoe Lake, she further testified as to the "free passage" that existed across such real estate, that she had never been told not to use such real estate, that she was unaware of anyone being told not to use such real estate, and that no one prevented her uses of such real estate.

22. No one has historically taken any action to prevent any person from using any portion of the real estate north of Lots 12 through 33 in Cripplegate Heights as extended to the water's edge of Tippecanoe Lake.

23. The non-exclusive historical uses of the real estate north of Lots 12 and 13 are consistent with those non-exclusive historical uses of the real estate north of Lots 13 and 14 in Cripplegate Heights as extended to the water's edge of Tippecanoe Lake considered by this Court [in a 1996 ruling that Lake Boulevard "was set apart for purposes of ornament, exercise, and amusement" and that lakefront landowners cannot obstruct the use of Lake Boulevard by others...."][4]

**4.** See Finding of Fact # 12, which explains the 1996 judgment. Appellant's App. at 9–10.

* * *

35. As supported by the records admitted into evidence and testimony of Susan Stookey, the Plain Township Assessor, and Jill Morrolf, the Morrolfs and their predecessors-in-interest paid and discharged the real estate taxes due on the Morrolf Real Estate, including that portion of the Morrolf Real Estate north of Lot 13 as extended to the water's edge of Tippecanoe Lake.

36. As supported by the records admitted into evidence and testimony of Susan Stookey, Plain Township Assessor, Daisy Farm and its predecessors-in-interest paid and discharged the real estate taxes due on the Daisy Farm Real Estate, including that portion of the Daisy Farm Real Estate north of Lot 12 as extended to the water's edge of Tippecanoe Lake.

37. Daisy Farm did not pay any real estate taxes due on the Morrolf Real Estate, including that portion of the Morrolf Real Estate north of Lot 13 as extended to the water's edge of Tippecanoe Lake.

Appellant's App. at 13–15.

Initially, it is clear from Findings of Fact 19–23 that the trial court determined as a matter of law that Daisy Farm failed to show intent (exclusivity) because other people, including other lakefront owners and the general public, exercised an easement across the north portions of Lot 13. In explaining the trial court's reasoning, the Morrolfs cite to *Sims v. Town of New Chicago*, 842 N.E.2d 830 (Ind.Ct.App.2006) and similar cases for the proposition that prescriptive rights cannot be acquired in property affected with public interest or dedicated to public use. Appellees' Brief at 19. As explained in *Sims*, however, these cases hearken back to the ancient common law maxim that "no prescriptive right could be asserted against the king," which is now expressed as "[n]o prescriptive right can be obtained against the *Government.*" *Id.* at 834. (emphasis provided). Thus, these cases have no application here where Daisy Farm is asserting a prescriptive right against the Morrolfs.

The Morrolfs also cite *Naderman v. Smith*, 512 N.E.2d 425, 431 (Ind.Ct.App. 1987) for the proposition that "a permitted use cannot be adverse so as to ripen into fee simple ownership through adverse possession. If an easement is enjoyed under a deed, there can be no adverse enjoyment until the expiration of the right under the deed." This case is applicable in the present case only if the use by Daisy Farm and its predecessors does not exceed the use granted to other Cripplegate owners and the general public. Of course, by introducing evidence of installing hedges and planting flower gardens, Daisy Farm is asserting that it acquired the disputed portion of Lot 13 not by engaging in the permitted use but by exceeding those rights given to the other Cripplegate owners and the general public. Thus, Daisy Farm is asserting that it acquired by adverse possession a portion of Lot 13 from the Morrolfs as private owners and that it acquired the lot subject to the same easement that was imposed on the Morrolfs.

It is also clear from Findings of Fact 35–37 that the trial court determined as a matter of law that Daisy Farm cannot prevail on its adverse possession claim because neither Daisy Farm nor its predecessors paid taxes on the disputed section. Although the trial court did not mention Ind.Code § 32–21–7–1 in its findings, it is clear that these findings are based on the statute, which states that possession of the land or real estate is not adverse to the owner in a manner as to establish title or rights in and to the land or real estate

unless the adverse possessor or claimant "pays and discharges all taxes and special assessments that the adverse possessor or claimant reasonably believes in good faith to be due on the land or real estate during the period the adverse possessor or claimant claims to have possessed the land or real estate adversely." In *Fraley,* the Supreme Court reaffirmed an earlier holding that "permits substantial compliance to satisfy the requirement of the adverse possession tax statute in boundary disputes where the claimant has a reasonable and good faith belief that the claimant is paying the taxes during the period of adverse possession." 829 N.E.2d at 493. Here, although there is testimony of the reasonable and good faith belief of Daisy Farm's predecessors, the trial court made no finding or conclusions about that belief. That leads us to believe that the trial court did not consider the credibility of such evidence.

In summary, we conclude that the trial court did not err in concluding that riparian rights could be determined by extending the property lines of the lots into Lake Tippecanoe. We further conclude that the trial court erred in determining as matter of law that Daisy Farm and its predecessors were prohibited from acquiring a portion of Lot 13 on the basis that they, along with other Cripplegate owners and the general public, had the right to use northern portions of the lot as a thoroughfare and/or beach area. The trial court was required to determine whether Daisy Farm and/or its predecessors in title exerted sufficient control, intent, notice, and duration in addition to the permitted use under the easement. Finally, we conclude that the trial court erred in not considering whether Daisy Farm and its predeces-

sors substantially complied with Ind.Code § 32–21–7–1.[5] We reverse and remand for further proceedings consistent with this opinion, with instructions that the trial court make determinations based upon the evidence already presented.

Reversed and remanded with instructions.

DARDEN, J., and VAIDIK, J., concur.

---

**5.** We note that Daisy Farm believes that this court should make factual determinations based on the evidence presented in the rec-

ord. Because the evidence is disputed, we leave these determinations to the trier of fact.