**FOR PUBLICATION**



**FILED**

Jun 27 2012, 10:30 am

*Kevin S. Smith*

**CLERK**
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANTS:

**JERE L. HUMPHREY**
Wyland, Humphrey, Wagner & Clevenger, LLP
Plymouth, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**ANDREW R. FALK**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

|  |  |  |
|---|---|---|
| GUNTHER KRANZ and CAROL KRANZ, | ) | |
| | ) | |
| Appellants-Petitioners, | ) | |
| | ) | |
| vs. | ) | No. 75A03-1112-PL-577 |
| | ) | |
| MEYERS SUBDIVISION PROPERTY | ) | |
| OWNERS ASSOCIATION, INC., | ) | |
| CHRISTOPHER BARTOSZEK, and INDIANA | ) | |
| DEPARTMENT OF NATURAL RESOURCES, | ) | |
| | ) | |
| Appellees-Respondents. | ) | |

APPEAL FROM THE STARKE CIRCUIT COURT
The Honorable Roger V. Bradford, Judge
Cause No. 75C01-1102-PL-2

**June 27, 2012**

**OPINION - FOR PUBLICATION**

**CRONE, Judge**

**Case Summary**

Gunther and Carol Kranz own property on Bass Lake that is subject to an easement by other landowners in the Meyers Subdivision ("the Subdivision"). In prior, separate proceedings, the Natural Resources Commission ("the NRC") determined that the easement holders had the right to place a pier at the end of the easement, but they would have to apply for a permit for a group pier ("the Group Pier") from the Department of Natural Resources ("the DNR").[1] The DNR initially denied the permit because it believed that the Group Pier's proximity to neighboring piers created a safety hazard. The easement holders requested a hearing before an administrative law judge ("the ALJ"), who determined that the easement holders should be allowed to have a group pier and that the Kranzes should move their pier to accommodate the Group Pier. The Kranzes appealed to the NRC, which adopted the ALJ's decision.

The Kranzes then sought judicial review in the Starke Circuit Court. The Kranzes advanced four reasons for reversing the NRC's decision: (1) that the NRC lacked jurisdiction to determine property rights; (2) that the decision was arbitrary and capricious because the NRC did not follow its own rule; (3) that the decision was not supported by substantial evidence; and (4) that the decision effected an unconstitutional taking. The trial court affirmed, and the Kranzes appealed to this court. We conclude that the NRC has

---

[1] The NRC "is an autonomous board that addresses issues pertaining to the [DNR]. This twelve-member board includes seven citizens chosen on a bipartisan basis, three ex officio members from state agencies, and one representative of the Indiana Academy of Science." *Meet the NRC*, www.in.gov/nrc/2352.htm (last visited June 7, 2010). *See also* Ind. Code § 14-10-1-1 (establishing the NRC).

2

jurisdiction to render a decision concerning property rights to the extent necessary to implement the permit process. We also conclude that the NRC properly interpreted and applied its own rule. Further, the evidence favorable to the decision is that the safety concerns were alleviated by moving the neighboring piers away from the Group Pier. Finally, we conclude that there was not an unconstitutional taking of the Kranzes' property. Because Bass Lake is a public freshwater lake, the only effect of the NRC's decision on the Kranzes' property rights was to relocate their pier, and there was no indication that the pier was any less usable in the location chosen by the NRC. The decision does not deprive the Kranzes' property of all or substantially all of its economic or productive use and therefore is not an unconstitutional taking. Therefore, we affirm.

**Facts and Procedural History**

The Kranzes own Lot 49 of the Subdivision. The Kranzes' property is bordered on the north side by Bass Lake, which is a public freshwater lake. The western fifteen feet of the Kranzes' property is subject to an easement held by the property owners in the Subdivision who do not have lakefront property. Lot 48, which borders the Kranzes' property on the west, is owned by Christopher Bartoszek. For a period of several decades, the easement holders placed a pier ("the Group Pier") at the end of the easement in order to access the lake.

In the spring of 2007, a dispute arose between the easement holders and the Kranzes and Bartoszek regarding the Group Pier. Sometime during 2007, DNR Conservation Officer Brian Culbreth examined the deed creating the easement and determined that it created only a

3

right to a path to the lake, not to placement of a pier in the lake.

On October 15, 2007, the easement holders initiated administrative proceedings before an ALJ to review Officer Culbreth's determination. The Kranzes and Bartoszek were respondents in those proceedings. The DNR was also added as a third-party respondent because of its regulatory authority over the lake.

Each party was ordered to provide the ALJ with a written statement of contentions. The easement holders contended that their easement included the right to place a pier in the lake and, alternatively, that they had obtained such a right through adverse possession. The Kranzes and Bartoszek denied these contentions. The DNR's statement identified four issues: (1) whether the easement contained a grant of riparian rights; (2) if so, whether the right to place a pier in the lake was among those rights; (3) what the dimensions of any riparian zone created by the deed were; and (4) whether the easement holders were required to obtain a permit from the DNR before placing a pier in the lake.[2]

On July 16, 2008, after an evidentiary hearing, the ALJ issued his order. The ALJ found that the deed was ambiguous as to the intent of the easement, and therefore considered extrinsic evidence, including the testimony of easement holders Nancy Adochio, Richard Leadbetter, and Lori Bridegroom. The ALJ found that Richard Leadbetter's testimony was particularly persuasive because he had owned property in the Subdivision since 1956 and was

---

[2] Riparian rights have been traditionally associated with owners of land abutting a river or stream, while those with shoreline on a lake or pond acquired littoral rights. *Zapffe v. Srbeny*, 587 N.E.2d 177, 178 n.1 (Ind. Ct. App. 1992). *trans. denied*. However, the term "riparian" is now widely used to refer to both classes of ownership. *Id*.

4

able to testify with clarity and specificity as to the historical use of the easement and pier. Leadbetter testified that in 1962, Joseph Meyers, the creator of the Subdivision, gathered the property owners and informed them that the easement was going to be moved from Lot 48 to its present location on Lot 49. Meyers told the easement holders to move their pier to the new location. At various times, railroad ties, wooden beams, or rocks have been placed along the shoreline to control erosion. Currently, there is a stone seawall extending across Lot 49. Leadbetter and Bridegroom testified that a pier was a "practical necessity" for getting over the wall and into the water. *Adochio v. Kranz*, 11 CADDNAR 400, 413 (2008), *available at* www.in.gov/nrc/decision/07-204w.v11.htm. The ALJ found that the Kranzes' and Bartoszek's testimony was partially based on hearsay and was less credible than the easement holders' testimony.

The ALJ found that the easement holders had established, by a preponderance of the evidence, that the easement included the right "to place a pier to facilitate reasonable access to Bass Lake. At a minimum, the pier must afford the ability to safely and conveniently traverse shoreline structures, such as seawalls." *Id*. The ALJ determined that the Group Pier was a structure that required a permit from the DNR. Thus, the easement holders were entitled to place a pier in the lake upon successful completion of the permit process. Neither the Kranzes nor Bartoszek sought judicial review of the decision.

On November 6, 2009, Adochio, as secretary of the Meyers Subdivision Property Owners Association ("the Association"), submitted an application for a group pier on behalf of the Association. The application requested permission for a pier 171 feet in length

5

extending from the easement. It would be three feet wide with a sitting bench and a ladder into the water. On January 18, 2010, Adochio supplemented the application with additional information requested by the DNR. Adochio confirmed that the easement holders did not intend to moor boats at the Group Pier.

The DNR denied the permit for four reasons:

1. the proposed project will both infringe on the access of an adjacent landowner to the public freshwater lake and will unduly restrict navigation

2. public safety is a primary concern due to the very narrow corridor that is created on both sides of the proposed pier; as a result of these narrow corridors, boaters and swimmers are at a real or potential risk when put together in the water at the same time

3. due to the very narrow corridors navigation is unduly restricted; boats cannot safely navigate in these corridors without risking damage to their boats or damage to piers when attempting to navigate in these corridors

4. compatibility with the activities of other riparian owners is infringed upon due to the narrow corridors created

Appellants' App. at 49.

The Association requested review by an ALJ, and an evidentiary hearing was held on July 8, 2010. Easement holders Gail Gorman, Harry Adamek, Bridegroom, and Adochio testified in support of the application. Their testimony indicates that approximately twenty-two properties are part of the Association, and four property owners have opted out of the Association and therefore would not be using the Group Pier, although they could still use the pathway. Easement holders also bring guests with them on occasion. Association members like to sit on the pier or use it to access the water for swimming. A lengthy pier is needed because Bass Lake is generally very shallow, sometimes only waist-deep at the

6

center. Seniors with limited mobility particularly need a pier to get over the seawall. People sometimes bring their boats up to the Group Pier to pick up passengers, but boats would not be moored there. Easement holders kept their boats at a marina or made arrangements with neighbors who had lakefront property.

Use of the Group Pier varies somewhat, with weekends being a little busier and holidays being the busiest time. Adochio testified that about sixteen Association members use the marina instead of the Group Pier, about nine members are senior citizens who use the Group Pier primarily for sitting, and about eleven members use the Group Pier for general recreational purposes. Adochio testified that there were typically four to five people at a time in the area of the Group Pier and the easement, and even at busier times, usually twelve or fewer.

The easement holders testified that the Bartoszeks and the Kranzes had moved their piers toward the easement to "squeeze [them] out." Tr. at 15. They asserted that there had not been accidents in the past, and there would not be safety or navigational issues if the Bartoszeks and the Kranzes moved their piers toward the center of their shorelines. The Kranzes' pier is 250 feet long, giving them seventy-nine feet that they could use to moor their boat without concern of interference from the Group Pier.

Bartoszek testified that he had moved his pier eastward toward the easement in order to accommodate his neighbor to the west, who needs a relatively wide pier with a ramp due to a disability. Bartoszek testified that sometimes there are twelve to fifteen people swimming near the Group Pier, and he sometimes does not go out in his boat because he

does not feel that he can navigate around all the swimmers. His mother, Maria, previously owned the property. She testified that the pier had always been somewhat toward the east end of their property and claimed that it had been moved over further because she and her husband felt that their riparian zone was too crowded.

Gunther Kranz was not able to testify to any actual accidents in the area near the Group Pier, but did testify in detail to practices that he felt were unsafe, such as swimming at night. Gunther asserted that he had avoided safety issues "by avoiding confrontation" or simply not going out on the lake with his boat. *Id*. at 119. He stated that two of the support pipes for his pier had been bumped, but he did not know how it had happened. He testified that generally ten to twelve people at a time used the Group Pier on weekends. He is not always able to pull out directly from his pier, but sometimes must pass through the riparian zone of his neighbor to the east to reach the deeper parts of the lake. The Kranzes' son, Stephen, testified that they had moved their pier because the neighbors to the east had asked them to. He claimed that there were ten to twenty people in the area of the Group Pier on a normal weekend. He stated that there was one occasion when he was bringing his boat into his parents' pier and nearly hit a small child who darted in front of him.

Lieutenant Jerry Shepherd, a conservation officer, testified that he recommended denial of the permit because the configuration of piers created narrow corridors. He was not aware of any accidents in the area of the Group Pier, but felt that the narrow corridors created real potential for safety or navigational issues. Lieutenant Shepherd testified that an average boat is more than ten feet long and would not be able to turn around in the space between the

8

Group Pier and the neighboring piers. Some boaters might not have the skill to back in or out, and the presence of swimmers would also make safe navigation more difficult. Lieutenant Shepherd felt that a Group Pier would be unproblematic if there was fifteen to twenty feet of clearance on each side. Jim Hebenstreit, the assistant director of the DNR's Division of Water, stated that denial of the permit was based on Lieutenant Shepherd's recommendation, and he echoed Shepherd's concerns about navigability and safety.

The ALJ took notice of *Adochio*, which the parties stipulated was entitled to res judicata effect. The parties also stipulated that "appropriate delineation of riparian zones was described by the straight-line extension of property lines." Appellants' App. at 19. The ALJ found that "the site can become crowded with both human and boating traffic. Crowding is likely to be more serious during the weekends, and particularly the weekends associated with Memorial Day, Independence Day, and the Bass Lake Festival." *Id*. at 26. However, the ALJ found that if the Group Pier "were limited to 3½ feet in width and placed at the center of the 15-foot wide easement, and if [Bartoszek's] pier and the Kranzes' pier were each moved ten feet farther away, Lt. Shepherd's concerns for navigational safety would be resolved." *Id*.

The ALJ ordered Bartoszek to move his pier so that it was seven feet from the line between his property and the Kranzes'. The Group Pier was to be placed nine feet from the western boundary of the easement and two feet from the eastern boundary of the easement. The Kranzes were ordered to move their pier fourteen feet to the east of the eastern edge of the easement. The Association was authorized to construct a pier no longer than 125 feet

9

long. The ladder was permitted, but the sitting bench was not; nor may the Association members moor boats at the Group Pier. Bartoszek and the Kranzes were allowed to have piers up to 300 feet in length and were ordered not to moor boats within the buffer zone that the ALJ created between their piers and the Group Piers.

After the ALJ's order was issued, the Kranzes raised two additional issues, which the ALJ addressed in a supplemental order on December 22, 2010. The Kranzes contended that the NRC lacked jurisdiction "to resolve a dispute concerning riparian ownership." *Id*. at 32. The ALJ rejected that argument, concluding that determination of riparian rights was reasonable and necessary to implement the DNR's statutory powers and duties. The Kranzes also argued that the ALJ's order resulted in an unconstitutional taking. The ALJ found that issue to be waived because it was not timely raised. On January 14, 2011, the NRC affirmed the ALJ's decision and adopted his order as its final order.[3]

On February 8, 2011, the Kranzes filed a petition for judicial review of the NRC's decision in the Starke Circuit Court. The court heard oral argument on November 3, 2011. On November 30, 2011, the court affirmed the NRC's decision. The court held that the NRC "had jurisdiction to determine all issues involved including determination of easements." *Id*. at 39. The court held that the NRC's decision was not arbitrary or capricious, not an abuse of discretion, and not contrary to law. Finally, the court held that restricting the location of the

---

[3] The NRC's decision is reported in CADDNAR as *Meyers Subdivision POA v. DNR*, 12 CADDNAR 282 (2011), *available at* www.in.gov/nrc/decision/10-093w.v12.htm.

Kranzes' pier was not a "taking." *Id.* The Kranzes now appeal.[4]

**Discussion and Decision**

The Kranzes seek review of a decision by an administrative agency. Pursuant to the Administrative Orders and Procedures Act, a reviewing court may neither try the case de novo nor substitute its judgment for that of the agency. Ind. Code § 4-21.5-5-11. We give deference to the agency's expertise. *Ind. Dep't of Envtl. Mgmt. v. Schnippel Const., Inc.*, 778 N.E.2d 407, 412 (Ind. Ct. App. 2002), *trans. denied.* We do not reverse the agency's decision unless the action is: (1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (2) contrary to constitutional right, power, privilege, or immunity; (3) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; (4) without observance of procedure required by law; or (5) unsupported by substantial evidence. Ind. Code § 4-21.5-5-14(d).

The burden of demonstrating the invalidity of an agency action is on the party asserting its invalidity. Ind. Code § 4-21.5-5-14(a). "A decision is arbitrary and capricious when it is made without any consideration of the facts and lacks any basis that may lead a reasonable person to make the same decision made by the administrative agency." *Schnippel*, 778 N.E.2d at 412. We do not weigh evidence or judge the credibility of witnesses. *Ind. Alcoholic Beverage Comm'n v. River Road Lounge, Inc.*, 590 N.E.2d 656, 658 (Ind. Ct. App.

---

[4] Bartoszek was named a defendant in the Kranzes' petition for judicial review, but the record does not reflect that he challenged the NRC's decision, and he is not involved in this appeal.

1992), *trans. denied*. Although we accord the agency's interpretation of its governing statutes great weight, we are not bound by the agency's interpretation. *Id.*

The Kranzes challenge the NRC's decision on four grounds: (1) that the NRC lacks jurisdiction to determine property rights; (2) that the decision was arbitrary and capricious because the NRC failed to follow its own rule; (3) that the decision is not supported by substantial evidence; and (4) that the decision results in an unconstitutional taking.

## I. Jurisdiction

The Kranzes challenge both *Adochio* and the NRC's decision in this case to the extent that the decisions were based on the NRC's determination of the respective parties' property rights. The powers of administrative agencies are limited to those granted by their enabling statutes. *Howell v. Indiana-American Water Co.*, 668 N.E.2d 1272, 1275 (Ind. Ct. App. 1996), *trans. denied*. "Thus, a party cannot confer jurisdiction upon an administrative agency by consent or agreement. Any act of an agency in excess of its power is *ultra vires* and void." *Id.* at 1276-77 (citation omitted). "Judgments rendered without personal or subject matter jurisdiction are void and may be directly or collaterally attacked at any time." *Person v. Person*, 563 N.E.2d 161, 163 (Ind. Ct. App. 1990), *trans. denied*. "Subject matter jurisdiction cannot be waived, and courts at all levels are required to consider the issue *sua sponte*." *Jernigan v. State*, 894 N.E.2d 1044, 1046 (Ind. Ct. App. 2008).

The Lake Preservation Act, Indiana Code Chapter 14-26-2, gives the State "full power and control of all of the public freshwater lakes in Indiana." Ind. Code § 14-26-2-5(d)(1). The State "holds and controls all public freshwater lakes in trust for the use of all the citizens

12

of Indiana for recreational purposes." Ind. Code § 14-26-2-5(d)(2). The owner of property bordering a public freshwater lake, such as Bass Lake, "does not have the exclusive right to the use of the waters of the lake or any part of the lake."[5] Ind. Code § 14-26-2-5(e).

To protect citizens' interest in public freshwater lakes, the legislature tasked the DNR and NRC with implementing a permit process for placing structures in the lake or along the shoreline:

> (a) Unless a person obtains a permit from the [DNR] under this section and conducts the activities according to the terms of the permit, a person may not conduct the following activities:
>
> (1) Over, along, or lakeward of the shoreline or water line of a public freshwater lake:
>
> …
>
> (C) place, modify, or repair a temporary or permanent structure.
>
> …
>
> (b) An application for a permit for an activity described in subsection (a) must be accompanied by the following:
>
> (1) A nonrefundable fee of one hundred dollars ($100).
>
> (2) A project plan that provides the department with sufficient information concerning the proposed excavation, fill, temporary structure, or permanent structure.
>
> (3) A written acknowledgment from the landowner that any additional water area created under the project plan is part of the public freshwater lake and is dedicated to the general public use with the public rights described in section 5 of this chapter.

---

[5] The parties agree that Bass Lake is a public freshwater lake.

(c) The [DNR] may issue a permit after investigating the merits of the application. In determining the merits of the application, the [DNR] may consider any factor, including cumulative effects of the proposed activity upon the following:

(1) The shoreline, water line, or bed of the public freshwater lake.

(2) The fish, wildlife, or botanical resources.

(3) The public rights described in section 5 of this chapter.

(4) The management of watercraft operations under IC 14-15.

(5) The interests of a landowner having property rights abutting the public freshwater lake or rights to access the public freshwater lake.

….

(e) The [NRC] shall adopt rules under IC 4-22-2 to do the following:

(1) Assist in the administration of this chapter.

(2) Provide objective standards for issuing permits under this section, including standards for the configuration of piers, boat stations, platforms, and similar structures. The standards:

(A) may provide for a common use if the standard is needed to accommodate the interests of landowners having property rights abutting the public freshwater lake or rights to access the public freshwater lake; and

(B) shall exempt any class of activities from licensing, including temporary structures, if the [NRC] finds that the class is unlikely to pose more than a minimal potential for harm to the public rights described in section 5 of this chapter.

(3) Establish a process under IC 4-21.5 for the mediation of disputes among persons with competing interests or between a person and the [DNR]. A rule adopted under this subsection must provide that:

14

(A) if good faith mediation under the process fails to achieve a settlement, the [DNR] shall make a determination of the dispute; and

(B) a person affected by the determination of the [DNR] may seek administrative review by the [NRC].

(f) After:

(1) a final agency action in a mediation under subsection (e)(3) that makes a determination of a dispute among persons with competing riparian interests; and

(2) the completion of judicial review or the expiration of the opportunity for judicial review;

a party to the dispute may seek enforcement of the determination in a civil proceeding. The remedy provided under this subsection is supplemental to any other legal remedy of the party.

Ind. Code § 14-26-2-23.

The DNR contends that Indiana Code Section 14-26-2-23 authorizes it to determine property and riparian rights to the extent necessary to implement the permit process. If we were to hold otherwise, the DNR argues, a person would always have to go to court for a determination of his or her property rights before applying for a permit, an unwieldy procedure that the legislature could not have intended.

The Kranzes argue that the NRC "has no right to determine property rights in the first instance, but can only regulate applicants who already have riparian rights." Appellants' Br. at 6. The Kranzes cite three cases originating in the trial courts to illustrate that jurisdiction lies in the courts rather than an administrative agency: *Brown v. Heidersbach*, 172 Ind. App.

15

434, 360 N.E.2d 614 (1977); *Klotz v. Horn*, 558 N.E.2d 1096 (Ind. 1990); and *Gunderson v. Rondinelli*, 677 N.E.2d 601 (Ind. Ct. App. 1997).

*Brown* concerned a subdivision on Lake George, which had been platted by the Brown family. The Smith family and the Heidersbach family owned lots that were not adjacent to the lake, but they held an easement over the Browns' property for access to the lake. The Browns later platted an addition to the subdivision and removed a pier that the easement owners had placed at the end of their easement. The Smiths and the Heidersbachs filed a complaint against the Browns seeking an injunction to prevent the Browns from expanding the number of persons authorized to use the easement and to prevent the removal of any future piers. The trial court granted the injunctions. We reversed, concluding that the language of the deeds did not convey any riparian rights but created only a pathway to the lake that was not held exclusively by the Smiths and Heidersbachs. *Brown*, 172 Ind. App. at 441-42, 360 N.E.2d at 620.

*Klotz* concerned a parcel of land abutting Eagle Lake that was owned by the Horn family. The Horns sold the rear portion of the plot to Nedra Sainer, along with a six-foot-wide easement for access to Eagle Lake. Sainer later sold the property to the Klotzes, who placed a pier at the end of the easement. The Horns demanded that the Klotzes remove the pier, but the Klotzes refused, so the Horns sought an injunction. The trial court enjoined the Klotzes from placing a pier or boat at the end of the easement, and we affirmed. Our supreme court reversed, concluding that the language of the deed was ambiguous, and the

16

trial court should have allowed the parties to present parol evidence concerning the original intent of the easement. *Klotz*, 558 N.E.2d at 1098.

*Gunderson* concerned a subdivision on Lake Myers. Mark Gunderson owned an easement across the Rondinelli family's property for access to the lake. Gunderson placed a boathouse on the easement, installed underground electrical cables, operated motor vehicles on the easement, and cut and piled shrubbery on the easement. The Rondinellis filed a lawsuit seeking to enjoin Gunderson from continuing these activities as well as constructing a pier or mooring boats. The trial court concluded that the easement was intended to create a walking path to the lake, and therefore granted the injunction. Gunderson appealed, and we affirmed, finding that Gunderson relied on evidence that was not favorable to the judgment and was not probative of the original owner's intent. *Gunderson*, 677 N.E.2d at 604.

The Kranzes argue that these decisions demonstrate that jurisdiction over cases concerning the scope of lake access easements and riparian rights is in the courts rather than the NRC. The Kranzes contend that if the NRC had jurisdiction in cases like *Brown*, *Klotz*, and *Gunderson*, then the plaintiffs' actions would have been dismissed for failure to exhaust administrative remedies.

The parties appear to assume that jurisdiction must lie exclusively with the courts or exclusively with the NRC. That is not necessarily the case. *See, e.g., Midwest Psychological Center, Inc. v. Ind. Dep't of Admin.*, 959 N.E.2d 896, 908-09 (Ind. Ct. App. 2011) (discussing the doctrine of primary jurisdiction), *trans. denied.* We need not define the exact parameters of the NRC's jurisdiction. Unlike *Brown*, *Klotz*, and *Gunderson*, the case before

17

us solely concerns placement of a pier on a public freshwater lake. *Brown* and *Gunderson* addressed multiple issues, only one of which was the placement of a pier in a lake. It is not clear from the opinions whether the lakes at issue in *Brown* and *Klotz* were public freshwater lakes.[6] Finally, none of these cases addressed the grant or denial of a permit.

The DNR and NRC are responsible for implementing the statutory process of issuing permits for piers on public freshwater lakes. In adopting rules and issuing permits, the DNR is charged with considering a variety of factors, including the public rights listed in Indiana Code Section 14-26-2-5 and the interests of landowners who own property abutting the lake. Ind. Code § 14-26-2-23(c) and (e)(2). The DNR is also charged with creating a process "for the mediation of disputes among persons with competing interests," and the DNR has the authority to resolve the issues if the parties do not reach a settlement. Ind. Code § 14-26-2-23(e)(3). Finally, Indiana Code Section 14-11-1-6 charges the DNR generally with enforcing the "laws for the conservation and development of the natural resources of Indiana." We conclude that the NRC has jurisdiction to determine the scope of a lake access easement or riparian rights to the extent necessary to carry out the process of issuing permits for the placement of piers on public freshwater lakes.

---

[6] Indiana Code Section 14-26-2-24 requires the NRC to maintain a list of public freshwater lakes, which can be accessed online at www.in.gov/legislative/iac/20110601-IR-312110313NRA.xml.pdf (last visited June 7, 2012). *Gunderson* referred to "Myers Lake in Marshall County," 677 N.E.2d at 602, which is on the list. *Klotz* originated in Elkhart County, but there is no Eagle Lake in Elkhart County. Two Eagle Lakes are on the list, one in Noble County and one in Starke. *Brown* originated in DeKalb County, but there is no Lake George in DeKalb County. Two lakes named George are on the list, one in Lake County and one in Steuben County. The opinions in *Klotz* and *Brown* do not provide any information from which we can determine whether the lakes at issue in those cases are among the four possibilities on the NRC's list.

18

The Kranzes express concern that the NRC lacks the legal expertise to make legal determinations about the scope of lake access easements or riparian rights. We believe that those concerns are unfounded. The NRC has authority to: (1) administer oaths and certify to official acts; (2) require information from any person for purposes of Title 14; (3) issue subpoenas; (4) require the attendance of witnesses; and (5) examine witnesses under oath. Ind. Code § 14-11-1-3. The proceedings before the ALJ were substantially similar to proceedings before a court. To the extent that construing a deed might approach the outer limits of an ALJ's expertise, the risk of error is reduced by the fact that an affected party can seek review by the NRC, by a trial court, by this court, and potentially by the supreme court. In sum, we do not find the Kranzes' arguments concerning jurisdiction to be availing; therefore, we proceed to the merits of the NRC's decision.

## II. Application of NRC Rules

The Kranzes argue that the NRC's decision was arbitrary and capricious because it failed to follow one of its own rules, 312 Indiana Administrative Code 11-4-8(c)(1). That rule states:

> (c) The [DNR] shall condition a license for a group pier so the placement, configuration, and maintenance of the pier …:
>
> (1) Provide a reasonable buffer zone between the pier and the:
>
>> (A) portion of the lake two hundred (200) feet from the shoreline or water line; and
>>
>> (B) riparian zone of adjacent property owners to provide for reasonable navigation by the adjacent property owner and by the public. Except as otherwise provided in this clause, the department shall require at least five (5) feet of clearance on

19

both sides of a riparian line (for a total of ten (10) feet). The department may require as much as ten (10) feet of clearance on both sides of a riparian line (for a total of twenty (20) feet) if, based upon the opinion of a qualified professional, additional clearance is required for reasonable navigation. The department may approve an exception to this clause where adjacent riparian owners use a common pier along their mutual property line, and the purposes of this clause are satisfied by waters elsewhere within their riparian zones.

The Kranzes argue that the NRC "took fourteen (14) feet from the Kranzes' property[,] seven (7) feet from Bartoszek's lot[,] and none from Meyers subdivision because 'they don't have anything to give up'."[7] Appellants' Br. at 12. We disagree with the Kranzes' interpretation of this rule. Their argument appears to assume that the easement holders have their own riparian zone. "Generally, a property owner whose property abuts a lake, river, or stream possesses certain riparian rights associated with ownership of such a property." *Center Townhouse Corp. v. City of Mishawaka*, 882 N.E.2d 762, 767 (Ind. Ct. App. 2008), *trans. denied*. Riparian rights "are special rights pertaining to the use of water in a waterway adjoining the owner's property," and may include access, swimming, fishing, bathing, boating, and installation of a pier. *Daisy Farm Ltd. v. Morrolf*, 886 N.E.2d 604, 607 (Ind. Ct. App. 2008), *trans. denied*. Holders of a lake access easement do not acquire riparian rights, but may acquire the right to "*use* the riparian rights of the servient tenant." *Klotz*, 558 N.E.2d at 1097.

In *Adochio*, the NRC determined that the easement included the use of the Kranzes' riparian rights in the area corresponding to the boundaries of the easement. This fifteen-foot

---

[7] The Kranzes do not supply a citation for the phrase in quotation marks.

area is not a separate riparian zone, but falls entirely within the Kranzes' riparian zone. Thus, the references in 312 Indiana Administrative Code 11-4-8(c)(1) to riparian lines and zones do not refer to the boundaries of the easement, but to the boundaries of the Kranzes' riparian zone. Both the Group Pier and the Kranzes' pier are entirely within the Kranzes' riparian zone, and both piers are at least five feet from the boundaries of the Kranzes' riparian zone.

The Kranzes' argument also appears to assume that the ten-foot buffer on each side of the Group Pier must fit entirely within the easement. However, the rule plainly states that there must be "five (5) feet of clearance on both sides of a riparian line." 312 Ind. Admin. Code 11-4-8(c)(1)(B). In other words, there must be five feet of clearance between Bartoszek's pier and the Bartoszek-Kranz riparian line, and five feet of clearance between the riparian line and the Group Pier. On its face, the rule does not appear to address the amount of clearance that should exist between the Group Pier and the Kranzes' pier, which are both located in the same riparian zone. Nevertheless, the NRC created a buffer of approximately sixteen feet, which is consistent with the spirit of the rule. Thus, we conclude that the NRC correctly applied 312 Indiana Administrative Code 11-4-8(c)(1).

### III.  Sufficiency of Evidence

The Kranzes next argue that the NRC's decision is not supported by substantial evidence because none of the reasons for the original denial of the permit have been alleviated. Lieutenant Shepherd testified that his primary concern was that the existing configuration of the piers created narrow corridors, which would make navigation more difficult and pose a threat to the safety of both swimmers and boaters. He also stated that he

21

would recommend approval if there were fifteen to twenty feet of clearance on each side of the Group Pier. The NRC's decision required Bartoszek, the easement holders, and the Kranzes to move their piers so that there would be approximately sixteen feet of clearance on each side of the Group Pier. The evidence favorable to the NRC's decision supports its conclusion that the new configuration of the piers remedies the original reasons for denying the permit for the Group Pier.

### IV. Constitutionality

The Kranzes argue that the NRC's decision expanded the easement and appropriated fourteen feet of their riparian zone. The Kranzes argue that their property was taken for a private use, which is prohibited by both the Fourteenth Amendment of the United States Constitution and Article 1, Section 21 of the Indiana Constitution. However, the issue of whether a taking is for a public or private purpose is beside the point if there is no taking in the first place. The NRC did not create a riparian zone for the easement holders, nor did it appropriate any portion of the Kranzes' riparian zone. The easement holders, along with any member of the general public, have always had a right to use any portion of Bass Lake. Likewise, the Kranzes are not required to stay out of the fifteen-foot easement or the buffer between their pier and the Group Pier. Nor are the Kranzes prohibited from venturing into other neighbors' riparian zones to access their pier.

The only effect of the NRC's order on the Kranzes is to restrict the area in which they may place a pier. A compensable taking may occur even if there is not a "direct seizure" of property. *Biddle v. BAA Indianapolis, LLC*, 860 N.E.2d 570, 577 (Ind. 2007).

The modern test states that regulation effects a taking if it deprives an owner of all or substantially all economic or productive use of his or her property. *See Lingle v. Chevron U.S.A., Inc.*, 544 U.S. 528, 538–40, 125 S. Ct. 2074, 161 L. Ed. 2d 876 (2005). *See also Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1019 & n.8, 1030, 112 S. Ct. 2886, 120 L. Ed. 2d 798 (1992); *Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 127, 98 S. Ct. 2646, 57 L. Ed. 2d 631 (1978). This test focuses on several factors: the economic impact of the regulation on the claimant, the extent to which the regulation interferes with reasonable investment-backed expectations, and the character of the government action. *Dep't of Natural Res. v. Ind. Coal Council, Inc.*, 542 N.E.2d 1000, 1003 (Ind. 1989); *Penn Cent.*, 438 U.S. at 124, 98 S. Ct. 2646.

*Id*. at 577-78 (footnote omitted).

The record reflects that there has been a pier extending from the easement since 1962, when the easement over Lot 49 was created. The NRC found that the Kranzes were aware of this usage: "The Kranzes and Bartoszek purchased their lots with knowledge of the existence and use of the subject easement. The Kranzes were formerly beneficiaries of the subject easement.[8] At the time of their purchases, various lot owners placed piers and moored boats within the subject easement." Appellants' App. at 29. When the NRC confirmed the easement holders' right to place a pier at the end of the easement, the Kranzes chose not to appeal that decision. The public has always had a right to use any portion of the lake, and the Kranzes have never had the right to exclude anyone from their riparian zone.

It is apparent that the lake is more crowded than the Kranzes would prefer. It is also apparent that some people who use the lake are not as safety-conscious and polite as the Kranzes would like. These problems do not stem from the NRC's decision. Given the nature

---

[8] The Kranzes previously owned a lot in the Subdivision that was not a lakefront property.

23

of the public's right to use the lake, the NRC's decision has at best a de minimis impact on the value of the Kranzes' property and their reasonable expectations.

The NRC's decision does not restrict the Kranzes' use of the lake, but merely requires them to move their pier several feet to the east. The record reflects that the Kranzes had previously placed their pier toward the center or the eastern edge of their riparian zone. There is no indication that the pier is any less usable at the location chosen by the NRC. The Kranzes' only proffered reason for moving their pier toward the easement was that they wished to give their neighbor to the east more space. The NRC's decision was designed to enable all the property owners in the Subdivision to enjoy the lake safely, something that the property owners themselves had not been able to accomplish without government intervention. The character of the government action is to resolve a dispute among property owners and to protect the public interest in the lake. The NRC's decision does not deprive the Kranzes of all or substantially all of their property's economic or productive use; therefore, the Kranzes have not demonstrated that the NRC's decision was a "taking" requiring compensation.

### *Conclusion*

The Kranzes have failed to show that the NRC lacked jurisdiction in this case or the factually related *Adochio* case. Nor have they shown that the NRC's decision was arbitrary and capricious or unsupported by substantial evidence. The NRC's decision is neither a physical nor a regulatory taking in violation of the state or federal constitutions. Therefore, the trial court was correct to affirm the NRC's decision, and we likewise affirm.

24

Affirmed.

VAIDIK, J., and BRADFORD, J., concur.